# EXHIBIT D

```
 1                   UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3    IN RE:                       .    Chapter 11

 4    ONCO INVESTMENT COMPANY, a    .    Case No. 04-10558(DDS)
      Delaware corporation, et al., .    Jointly Administered
 5                                  .
              Debtors.              .    Jan. 13, 2005 (11:20 a.m.)
 6                                  .    (Wilmington)

 7
                          TRANSCRIPT OF PROCEEDINGS
 8              BEFORE THE HONORABLE DONAL  D. SULLIVAN
                  UNITED STATES BANKRUPTCY COURT JUDGE
 9
```

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Exhibit D

2

1   THE CLERK: All rise.

2   THE COURT: Good morning, counsel, and ladies and
3   gentlemen. This is the time we scheduled for, I guess, a
4   status conference in ONCO, O-N-C-O. The parties who are
5   here, would you introduce yourself, the counsel.

6   MS. LENNOX: Certainly, Your Honor. I'm Heather
7   Lennox from Jones Day. I'm counsel for the debtors.

8   THE COURT: Okay.

9   MS. ZELMAN: I'm Karyn Zelman from Stroock Stroock
10  & Lavan for the Committee.

11  THE COURT: Karyn --

12  MS. ZELMAN: Zelman.

13  THE COURT: Zelman?

14  MS. ZELMAN: Zelman with a Z.

15  THE COURT: All right. Okay.

16  MR. DeFRANCESCHI: Dan DeFranceschi from Richard,
17  Layton & Finger also for the debtors.

18  MR. DONILON: Gregory Donilon from Morris, Nichols,
19  Arsht & Tunnell, co-counsel to the Creditors Committee.

20  MS. MERSKY: Rachel Mersky on behalf of Regen
21  Capital and other bondholders and unsecured creditors.

22  THE COURT: Okay, let me -- We'll go back, if you
23  do speak would you introduce yourself, because I'm afraid I
24  can't write fast enough. As I understand it, there's no
25  controversy in this matter, but you're going to tell me

3

1  whether or not there is.

2      MS. LENNOX: That's correct, Your Honor. I'll move
3  straight to the status conference, Your Honor. We did file a
4  notice of agenda of matters that were scheduled for hearing
5  today, all of which are either being resolved or will be
6  adjourned, so I don't think we need to go through those
7  seriatim unless you desire to.

8      THE COURT: How's the case doing? Again, you can
9  assume I've read some of the pleadings and -- I'm sorry. I
10 should introduce myself. I'm Donald Sullivan. I'm a
11 bankruptcy judge from Portland, Oregon, and I have the
12 pleasure of being here today.

13     MS. LENNOX: Pleasure to meet you, Your Honor.

14     THE COURT: As I understand -- and I get a little
15 dizzy when I come to Delaware because of the size of the
16 figures that we're talking about. I have trouble after the
17 first ten million. It becomes a little meaningless, but
18 we're talking about ONCO, as I understand it, is a large
19 mining and distribution and related transportation company.

20     MS. LENNOX: That's correct, Your Honor.

21     THE COURT: They've had sales in excess of what?
22 Four hundred million, plus the --

23     MS. LENNOX: That's correct.

24     THE COURT: -- operating revenues around $60, $70
25 million. That's a big company.

Exhibit D

4

1   MS. LENNOX: That's correct. Yes, it is a large
2   company, Your Honor.
3   THE COURT: Even in Oregon, it's a big company. An
4   enormous estate, I think. So, tell me if ONCO's filed or has
5   a somewhat complex plan of restructuring and where are you
6   and what can I do to help you?
7   MS. LENNOX: Well, Your Honor, we're actually
8   toward the end of this case. We confirmed the plan of
9   reorganization in November of last year, and we are in the
10  process of doing what we need to do to effective on the plan,
11  and it's our intention to go effective on the plan of
12  reorganization at the end of this month.
13  THE COURT: Can you tell me generally what the
14  restructuring -- There aren't any unsecured creditors. There
15  are no ma/pa-type creditors.
16  MS. LENNOX: There are probably a couple of those,
17  but actually our plan was, I think, rather unique.
18  Basically, and I'll go through the traunches of creditors for
19  you, but basically, with one exception, the plan provided for
20  reinstatement of claims and a hundred percent payout for all
21  of the creditors except for the unsecured bond debt which
22  agreed to convert itself to equity. So, we started with a
23  pre-petition bank facility that during this case was paid up
24  by a second DIP facility that we entered into. So the pre-
25  petition banks were taken care of. We had another secured

Exhibit D

1  layer of debt, which we called the mezzanine debt, that was
2  issued in the principal amount of $75 million, and it's been
3  accruing interest at 19 percent for some years.
4      THE COURT:  I've never heard that term before.
5  Maybe I should have.  A mezzanine debt.
6      MS. LENNOX:  It's intermediate between the --
7      THE COURT:  It's in the --
8      MS. LENNOX:  -- banks and the bonds, yes, Your
9  Honor.
10     THE COURT:  Okay.
11     MS. LENNOX:  In order to satisfy that debt, we
12 worked out an agreement with some of our principal
13 bondholders and some other folks who have agreed and
14 committed to put $85 million in new money into the
15 reorganized company, and in exchange for that, they'll
16 receive preferred stock.  That offer had to be done pursuant
17 to the SEC rules, and that offering actually is going on
18 right now.  The SEC let our registration statement go
19 effective at the end of the December, and so, that offering
20 is open now and will close -- It's a thirty-day offering, so
21 it will close, I want to say, January 25th, give or take a
22 day, and that's why we expect to have the money in and then
23 go effective by the end of the month.  We will be able to pay
24 up -- Between that money and a little bit of --
25     THE COURT:  When you say an offering, offering to

Exhibit D

6

who?  General to the general public or --

MS. LENNOX:  No, it's a restricted offer.  It's an offering basically to our bondholders to say, if you want to own this company and share in the preferred stock, put some more money in, you'll get preferred.  It's an offering to purchase preferred securities.

THE COURT:  Who's being wiped out?  Or is there anybody?

MS. LENNOX:  Equity got warrants in this case.  They're, again, a very short term warrant.  It's a thirty-day warrant.  They will have to purchase a warrant.  The warrants weren't exchanged for stock, and they have to purchase into the warrants, so we don't know whether any -- That is actually also part of the offering that's going on right now.  We don't know whether any of the former shareholders will purchase into that, but it's open for an offering right now.

THE COURT:  What kind of investor is Equity?  Is it mostly institutional?  People that know what they're doing or is it --

MS. LENNOX:  It's a combination.  They are probably some institutions.  Our largest holder, I believe, was families and trusts related to one of the -- to the Norton family.  The company's OgleBay Norton Company.  They're related to the Norton family.  There was some other shareholders who banded together and were active in the case

Exhibit D

1  as part of a group. There was not a committee, but they were
2  nonetheless active in the case and participated. Mr. Barr's
3  the representative of the Norton family, and he was sort of
4  the spearhead of this group, and those folks were wealthy
5  individuals.
6  　　　　　THE COURT: Let me ask. Why are -- What is the
7  goal?
8  　　　　　MS. LENNOX: We filed this case, Your Honor, to de-
9  leverage the balance sheet. In buying this plan we took
10 about $200 million worth of debt off the balance sheet. And
11 that was the goal. The businesses themselves are sound
12 businesses. So there weren't really operational issues, it
13 was really over leverage.
14 　　　　　THE COURT: They owed more money than income?
15 　　　　　MS. LENNOX: They had --
16 　　　　　THE COURT: To support the debt then; is that --
17 　　　　　MS. LENNOX: They had acquired several businesses
18 over the last several years and took on debt for those
19 acquisitions, and I think that's where they ran into some
20 cash flow considerations.
21 　　　　　THE COURT: Do you expect any controversy in this
22 case?
23 　　　　　MS. LENNOX: At this point, Your Honor, the case is
24 fairly well concluded. We need to go through the claims
25 process which we expect to be fairly streamlined and

relatively non-controversial, particularly because the unsecured creditors were reinstated so they'll be paid. So, it's really just a matter of determining the amounts. We will not be filing avoidance actions in this case.

THE COURT: You will not?

MS. LENNOX: We will not. There are two adversary proceedings that continue before Your Honor. Both are turnover-type actions. I can refer Your Honor to them. The first is a turnover action that the debtor's filed against a company called Here On Line to collect some AR. And there's a scheduling order on that that requires discovery to be concluded by March 21st and for motions for summary judgment to be filed by April 4th.

THE COURT: So, it's on track.

MS. LENNOX: It's on track. There is another adversary proceeding that we filed in August of the last year against an individual, former executive of the company named Michael Quart (phonetical) for turnover of some monies we believe he owes the company, and where that case stands, Your Honor, is there's been an answer -- complaint filed, answer filed, and the defendant, Mr. Quart filed a motion to transfer venue out of this Court to the District Court in the Northern District of Ohio. The plaintiff/debtors have opposed that motion, and we're awaiting a ruling on that motion.

**Exhibit D**

9

1    THE COURT: Where's it now?

2    MS. LENNOX: I'm sorry, Your Honor?

3    THE COURT: Where's the motion pending; here?

4    MS. LENNOX: Here, yes. There's an adversary
5 proceeding in this case where we have a motion that needs to
6 be ruled on.

7    THE COURT: Okay. Has it been heard or --

8    MS. LENNOX: To my knowledge it has not been heard.
9 It has been briefed, but we haven't had oral argument on it.

10    THE COURT: Okay.

11    MS. LENNOX: And that may not be necessary if Your
12 Honor feels that he can decide it on the papers.

13    THE COURT: I wasn't aware of it. Maybe I should
14 be aware of it. I'll let you know -- oral argument is always
15 helpful.

16    MS. LENNOX: Okay. Very good.

17    THE COURT: What's involved in the case?

18    MS. LENNOX: In this particular adversary
19 proceeding?

20    THE COURT: Yeah.

21    MS. LENNOX: The debtors filed the case because
22 they had an internal -- I don't know if it's a benefit
23 policy, but they had an internal program where for certain
24 executives or certain employees they would pay for some
25 schooling for the employee and in return there was

Exhibit D

obligations to stay employed for certain amounts of time. What happened was is the debtors paid for Mr. Quart's receipt of an MBA from Case Western Reserve University in Cleveland, and immediately to accept or receiving the degree, he left the employ.

  THE COURT: How much is involved in that?

  MS. LENNOX: Less than $70,000.

  THE COURT: It's not really a significant --

  MS. LENNOX: It's not significant.

  THE COURT: -- in the whole scheme of things.

  MS. LENNOX: In terms of dollar amounts, it's not significant, but, you know, in terms of precedential value for what folks can do to the company, it's kind of significant to the company. So --

  THE COURT: Okay, I'll track down where that is and if you don't have a date or something, we'll get one; okay?

  MS. LENNOX: Thank you, Your Honor. The other only remaining controversy in this case is not in front of the Bankruptcy Court. It now at the appellate level in the District Court. There was an adversary proceeding that was filed by some of the holders of our mezzanine debt against the debtors and the unsecured bondholders and a couple other defendants. And what happened with the mezzanine debt under the plan is it was being reinstated. So, the debtors reinstated it and then they're going to -- after we reinstate

it on the effective date we are then going to redeem it under the terms of the documents and pay up the notes pursuant to the terms of the documents. When this case filed, the mezzanine debt accelerated with a prepayment penalty of 18 percent. Under the terms of the documents, when we reinstate the debt and it decelerates, we can redeem it at 106 percent. So, I don't think the mezzanine debt has any question at this point what they're getting from the debtors or any quarrel with what they're getting from the debtors under the plan, rather, what they have argued, what they argued in the adversary proceeding was that they should be able to get that differential, that 12-point spread between the 106 percent and the 118 percent from the bondholders pursuant to some of the terms of the bond indenture. The parties briefed motions for summary judgment. Judge Rosenthal decided in the debtors' and the bondholders' favor against the mezzanine holders. The mezzanine have appealed that to the District Court.

THE COURT: Okay, then the question is whether or not the default rate should apply in these circumstances --

MS. LENNOX: I think the question is whether the effective reinstatement under the plan, which would decelerate the debt to, you know, whatever the agreement says had the bankruptcy not effected it. Whether that deceleration -- the effects of that deceleration can be for

12

1  the benefit of the debtors and the bondholders or just the
2  debtors. The mezzanine are arguing that, Well, since we
3  accelerated upon the filing at 118 percent and the
4  bondholders are still responsible for whatever we don't get
5  from the debtors and we want 118 percent. Judge Rosenthal
6  found that not to be the case. That's the issue that they
7  appealed.
8        THE COURT: Okay, and I have nothing to do with
9  that.
10       MS. LENNOX: Unless it's -- I wanted to bring it to
11 the Court's attention just in case it got remanded, but --
12       THE COURT: It's on track.
13       MS. LENNOX: Right, it is appealed and on track
14 right now. Those really are the matters that -- claims
15 resolution and the two adversary proceedings are really --
16 and final fee applications will probably be the real matters
17 that might be brought before Your Honor.
18       THE COURT: What can I do now that might help --
19       MS. LENNOX: I think the only thing that the
20 debtors are waiting for from Your Honor would be a date on
21 that adversary proceeding and perhaps a scheduling conference
22 depending on how Your Honor rules on that adversary
23 proceeding.
24       THE COURT: And I'll look it up or I'll track it
25 down and make sure you get the dates.

13

MR. DeFRANCESCHI: Your Honor, we can actually provide a binder with the appropriate papers if that would help on the transfer of venue?

THE COURT: That would help. It would save me some --

MR. DeFRANCESCHI: We'll provide that to Your Honor.

THE COURT: My skills on the computer are less than the best. Okay, I appreciate it. When might I get that?

MR. DeFRANCESCHI: Today? We can send it over --

THE COURT: Today, tomorrow, next week is fine. I'll take your word for --

MS. LENNOX: Your Honor, Ms. Walk did remind me that there is one little clean-up matter that we have left from the confirmation hearing. This company has against it significant amounts of mass tort litigation both asbestos and silica. That was reinstated under the plan, and the debtors didn't seek to shed themselves of those responsibilities. They're taking them forward into the future. Some of the tort claimants had nevertheless objected to confirmation of the plan, and we did reach a settlement with them, and Judge Rosenthal approved that settlement as part of confirmation. There was -- Attached to that settlement was a side deal that wasn't critical to confirmation or critical to the tort settlement, but there was a side deal among the tort

14

1  objectors, the debtors, and some of the debtors' insurers
2  from the London market.  That settlement is documented.  We
3  have most of the signatures on it, but because we're trying
4  to get signature from overseas and different plaintiffs'
5  counsel we're waiting on two more signatures.  Judge
6  Rosenthal had instructed us that when we get the signatures
7  we should submit the order to the Court under stipulation of
8  counsel.  We hopefully will get those signatures in the near
9  term, and we'd be prepared to do that.
10         THE COURT:  That's great.  There's no need to
11 notice it or have a hearing on it --
12         MS. LENNOX:  I don't think --
13         THE COURT:  Unless there's somebody who comes in.
14         MS. LENNOX:  Yeah, I don't think so, Your Honor.  I
15 mean, obviously, the certificate that we would file would be
16 served to all the parties on it and to the Committee.  I
17 think all the parties who were at the confirmation hearing
18 are well aware of the significance of this, so --
19         THE COURT:  I'll talk to Judge Rosenthal.  If he
20 thinks I ought to handle it, I'll handle it.  I'll deal with
21 it.  But you don't expect there will be any --
22         MS. LENNOX:  We don't expect controversy on it,
23 Your Honor.
24         THE COURT:  Okay.
25         MS. LENNOX:  And really, that's where the case

Exhibit D

1  stands. It's actually pretty well completed at this point.
2      THE COURT: When do you think a final decree might
3  come in or might be reasonably --
4      MS. LENNOX: Well, I think under the plan, if I'm
5  recalling this correctly, we have four to six months to
6  resolve claims. So as soon as the last claim is resolved,
7  then, obviously, depending on what happens with this
8  mezzanine appeal, I mean, depending on what happens with that
9  appeal may depend on when we can close the cases, but,
10 obviously, we'd like to close them as expeditiously as we
11 can.
12     THE COURT: I'm sure you do, but we have this
13 policy we don't like to let cases drift. If I were to set it
14 for a status conference with the anticipation that maybe it
15 will close before that date --
16     MS. LENNOX: Uh-huh.
17     THE COURT: -- without having to show up, what date
18 would you suggest? What month?
19     MS. LENNOX: I would say probably sometime in May
20 because I think we have until April to object to claims. So,
21 it might be prudent to set a status conference in the either
22 April or May.
23     THE COURT: Okay, we'll give you a May status
24 conference date and with the hope that if everything comes in
25 or a final decree is on its way, we can take it off.

Exhibit D

16

1  MS. LENNOX: Very good.

2  THE COURT: There are a number of people here.
3  Does anybody have any questions? Yes.

4  MS. MERSKY: Your Honor, Rachel Mersky of Monzack
5  and Monaco on behalf of Regen Partners. Regen Partners
6  purchased some of the bondholder debt. Nothing controversial
7  or to concern the Court or Your Honor, but in the public
8  offering there is a reference, I'm told by my clients, to the
9  fact that a consortium was interested in buying the company.
10 Outside the courtroom, I discussed with counsel this issue,
11 and they advised me that in fact that deal had been killed
12 back in December and was no longer on the table. My client
13 was only concerned because the insiders may have knowledge
14 that other bondholders who had a right to buy in did not
15 have, and that was my concern. As long as it is --

16 THE COURT: If it's off --

17 MS. MERSKY: If it's off, it's off. I just needed
18 to confirm that, which as I said, counsel has advised.

19 MS. LENNOX: Yeah, that took up quite a bit of the
20 confirmation hearing, Your Honor, and after we confirmed the
21 consortium withdrew their offers, and the deal went away.

22 THE COURT: Well, okay. We'll give you a date.
23 Can you give them a date?

24 THE CLERK: May 30th at 9:30.

25 THE COURT: Does that sound reasonable?

17

1  MS. LENNOX: That's fine, Your Honor.

2  THE COURT: Again, that can be taken off or if
3  something comes in and we can give you a special setting on
4  that.

5  MS. LENNOX: Okay, thank you, Your Honor.

6  THE COURT: You bet. What I anticipate is at that
7  time I'll either get a final decree -- I already have a final
8  decree, in other words saying everything -- Well, you won't
9  have the claims cleaned up; will you?

10  MS. LENNOX: Well, it depends, Your Honor, we may.
11  It's hard to tell because we're just starting the process
12  now, but we don't expect it to be very contentious.

13  THE COURT: Well, it would be nice to sign a final
14  order in the matter.

15  MS. LENNOX: Would that be a time, Your Honor, that
16  you would like to schedule final fee applications as well, or
17  would you like to do that earlier?

18  THE COURT: I'd like to do that earlier. I hate to
19  wait until the last --

20  MS. LENNOX: Okay.

21  THE COURT: I assume you'll get your fee
22  applications --

23  MS. LENNOX: We'll coordinate with the Clerk's
24  Office, thank you, Your Honor.

25  THE COURT: Okay, great. How much in fees are we

18

1  talking about?  A grand total of everybody?

2          MS. LENNOX:  Oh, boy, I didn't come prepared for
3  that one.  Shelly (phonetical) might know.  My general
4  counsel might know better than I do.  Twenty?  I was going to
5  guess about 20 million all told.

6          THE COURT:  Twenty million in fees?

7          MS. LENNOX:  It's enough to make your heart stop.
8  And that includes, Your Honor, bank fees.  Judge Rosenthal
9  had required banks' counsel to file fee applications in this
10 case as well, which is normally not the case.  So, we do have
11 bank counsel fee applications in this case as well.

12         THE COURT:  Who would be likely to object besides
13 the client?  I --

14         MS. LENNOX:  We do have a fee auditor appointed in
15 this case.  Judge Rosenthal --

16         THE COURT:  Right, oh, I forgot that, yeah.

17         MS. LENNOX:  -- wanted some assistance in that, and
18 at the last round of interim fee application hearings, we had
19 -- Judge Rosenthal adopted the fee auditor recommendations.
20 So -- but there's another professional to help.  Obviously,
21 the U.S. Trustee is looking over the fees, and the debtors
22 are monitoring them as well.  So, we've raised a couple of
23 objections.

24         THE COURT:  Well, if there's problems, they tend to
25 be negotiated in advance.

1        MS. LENNOX:  Most do, so I don't think that you're
2   going to have any huge fee disputes in front of Your Honor.
3   You may have a couple here and there.
4        THE COURT:  Okay, I'm going write down that it will
5   be a ceremonial --
6        MS. LENNOX:  Largely ceremonial.
7        THE COURT:  Thank you.
8        MS. LENNOX:  Thank you.
9        THE COURT:  Okay, thanks.  Thank you.  Thanks to
10  everybody.
11       THE CLERK:  All rise.
12       (Whereupon at 11:45 a.m. the hearing in this matter
13  was concluded for this date.)

14
15
16
17
18       I, Elaine M. Ryan, approved transcriber for the
19  United States Courts, certify that the foregoing is a correct
20  transcript from the electronic sound recording of the
21  proceedings in the above-entitled matter.
22
23  *Elaine M Ryan*                                    1-26-05
    Elaine M. Ryan
24  2801 Faulkland Road
    Wilmington, DE 19808
25  (302) 683-0221